**Margaret E. TEDESCO, et al., Plaintiffs,**

**v.**

**Stephen A. MISHKIN, et al., Defendants.**

**No. 82 Civ. 8753 (DNE).**

United States District Court, S.D. New York.

Feb. 25, 1986.

Bailey, Marshall & Hoeniger, New York City (Mitchell M. Bailey and Berthold H. Hoeniger and Neil V. Getnick, of counsel), for plaintiffs.

Grand & Ostrow, New York City (Lawrence S. Bader, of counsel), for defendant Steven A. Mishkin.

McGuire & Tiernan, New York City (Jeffrey A. Kehl, of counsel), for non-party witness Edward I. Winer.

Emmet, Marvin & Martin, New York City (Joseph A. Hanczor, of counsel), for defendants Bank of New York and Thomas J. Langan, Jr.

Bergadano, Zichello & Babchick, New York City (Joseph A. Bergadano, of counsel), for defendants David C. Dempsey, Donald N. Gibbs and Thomas R. Langan.

Ohrenstein & Brown, New York City (Richard Nechman, of counsel), for defendant Selahedin A. Velaj.

## OPINION AND ORDER

EDELSTEIN, District Judge:

This is a class action alleging securities fraud, common law fraud and a pattern of racketeering activity. Plaintiffs allege that defendant Steven A. Mishkin ("Mishkin")

and others engineered an intricate investment fraud, involving numerous investment trusts and several corporations. On March 2, 1984, plaintiffs' attorneys sought leave to apply for an order, pursuant to Rule 23(d) of the Federal Rules of Civil Procedure, prohibiting defendant Mishkin, his attorneys, agents or employees from communicating, directly or indirectly, with members of the class for the purpose of discouraging participation in or otherwise obstructing this class action. Plaintiffs' application was precipitated by the discovery of a letter, dated December 12, 1983, allegedly sent by Mishkin over the signature of Edward I. Winer ("Winer") to 117 class members. Plaintiffs' attorneys also sought costs and other sanctions against Mishkin for his conduct with respect to the letter, and such other relief as the court deems just and proper.

On March 7, 1984, an evidentiary hearing was commenced to determine the validity of plaintiffs' charges. Plaintiffs' counsel outlined some of the alleged acts on the part of defendant Mishkin which, in plaintiffs' view, constitute a continuing pattern of covert interference with and obstruction of this class action [1] and of other judicial proceedings in this district involving Mishkin. The alleged acts include false and misleading communications to class members, threats, subornation of perjury, and other *in terrorem* tactics. Based on the statement by plaintiffs' attorney that all witnesses necessary for the hearing were not present, the court adjourned the hearing on the motion for Rule 23(d) sanctions until March 15, 1984,[2] so that the court could ascertain all facts relevant to plaintiffs' application and to the question of what other measures, if any, the court should consider in the conduct of this class action. The court further specifically informed all parties that if at the conclusion of the evidentiary hearing, the court found that there had been subornation of perjury or other wrongful conduct by any defendant herein, the court would not hesitate to impose the full panoply of sanctions available.[3]

The hearing was resumed on March 20, 1984 and further sessions were held on March 21st, 27th and April 4th, 1984. At the last session of the hearing, the court expressly invited Winer and Mishkin to review the transcripts of their respective testimony at the hearing and granted each of them leave to submit an affidavit to amplify, correct or recant any hearing testimony. On April 25, 1984, Mishkin filed a brief affidavit, which in substance reaffirmed his hearing testimony. On April 18, 1984, Winer filed a ten page affidavit which does not contradict but rather amplifies Winer's hearing testimony.

After hearing the testimony and observing the demeanor of Mishkin, Winer and other witnesses at the hearing and after considering the aforesaid affidavits as well as Winer's prior affidavit sworn to March 6, 1984, all exhibits received into evidence at the hearing and the parties' proposed findings of fact and conclusions of law, the court finds the following facts established by at least a fair preponderance of the credible evidence.

## FINDINGS OF FACT

Mishkin was Winer's attorney, investment adviser and confidant for almost thirty years, and was involved in almost every aspect of Winer's business and personal planning. This attorney-client relationship continued until at least February 27, 1984, and as to certain matters involving Winer's company, Associated Button Company, even thereafter. Winer affidavit of April

---

**1.** On November 21, 1983, the court orally in open court certified the proposed class and announced that a written opinion would follow.

**2.** Upon application of Mishkin's attorneys, the hearing was subsequently rescheduled for March 20, 1984.

**3.** Prior to the adjournment of the March 7 hearing, Jeffrey A. Kehl, Esq., attorney for non-party witness Winer, tendered to the court Winer's affidavit, sworn to March 6, 1984. Such affidavit was submitted for the purpose of recanting certain deposition testimony given under oath by Winer in this action on February 28, 1984, Copies of the affidavit had been given to plaintiffs' attorneys late the previous evening and to Mishkin's attorneys on March 7, prior to the commencement of the hearing.

4, 1984 at ¶ 16. In the course of this relationship, Winer developed what he described as "blind trust" in Mishkin, which may explain much of Winer's subsequent conduct as found below. Hearing Transcript [hereinafter "Tr."] at 358.

At a pretrial conference held on November 21, 1983, the court granted plaintiffs' counsel leave to send notice to all then known members of the class, advising them of their possible right to claim reimbursement for some of their losses from the Clients' Security Fund of the State of New York ("Security Fund").[4] The letter, dated December 5, 1983, was sent by plaintiffs' attorneys and received by Mishkin and Winer shortly after December 5, 1983. Tr. at 237–38, 257.

Although the December 5, 1984 letter and enclosures were truthful and accurate, Winer was so angered by the letter and enclosures that he threw them away after reading them. Tr. at 334. He then telephoned Mishkin and offered to write a reply letter to be sent to all persons who had received the December 5th letter from plaintiffs' attorneys. Mishkin told Winer to "hold off." Winer Affidavit of March 6, 1984 ["Winer Aff. 3/6"], at ¶ 9.

Winer's angry reaction to the December 5, 1983 letter was based on what he heard from people who had attended the Chapter XI bankruptcy proceedings involving Mishkin and Highcrest Management Company, Inc. ("Highcrest") and from statements that Mishkin had made to him. Tr. at 336, Winer Aff. 4/18 at ¶ 7. At the time he received the letter, Winer had not seen the complaint or amended complaint herein, nor any other document filed in this action. Tr. at 321. Mishkin earlier had told Winer: (1) that if given the chance, he could "come back and repay everybody eventually"; (2) that he was being harassed by this class action and by plaintiffs' attorneys and "could not concentrate on getting his figures together and on getting things done that had to be done"; and (3) that the firm of Bailey & Hoeniger (the firm representing the plaintiffs herein, now Bailey, Marshall & Hoeniger) was trying to destroy him.

Prior to and during December 1983, Mishkin represented Winer in negotiations involving a proposed acquisition by Winer's Associated Button Company and the two had frequent telephone conversations regarding this transaction. Winer Aff. 3/6 ¶ 4; Tr. 208, 320. On December 10, 1983, a telephone conversation took place between Mishkin and Winer, during which Mishkin, who was then at his office in Ossining, New York, stated that he would stop off at Winer's house on his way home to Katonah, and that he had something he wanted to show Winer. Tr. at 303, 337–38. Mishkin arrived at Winer's house that afternoon and presented to Winer for his signature a letter, in Winer's name, which was to be sent to the members of the class. Tr. at 303–09, 339–40. Winer's wife Audrey was present when Mishkin arrived and spoke with Mishkin. Mishkin asked Winer to read the letter and to determine whether there were any changes that he wanted to make. Mishkin had not previously told Winer that he was writing any letter for Winer's signature, nor had Mishkin previously discussed with Winer any of the letter's language. Tr. at 337–39. Although Winer was somewhat shocked that Mishkin had drafted the letter for his signature, Winer read the letter and found that it accurately reflected the feelings he had

---

4. The letter informed the class members of the following:

> If Stephen A. Mishkin or the Mishkin law firm (originally known as Mishkin, Dempsey, Gibbs & Langan and later as Mishkin, Dempsey & Langan) performed legal services on your behalf, and if money or other property belonging to you was misappropriated or misapplied by Mr. Mishkin or by the Mishkin law firm in their capacity as attorneys, then you may be able to claim reimbursement of up to

$25,000 of your loss from the Clients' Security Fund of the State of New York, ...

Plaintiffs' Exhibit 10.

The court had approved a draft of the letter. Although the letter actually mailed contained a few additions to the approved draft, all additions were warranted and none materially altered the notice the court had approved. Along with the letter, plaintiffs' attorneys also mailed copies of claim form, explanatory brochure, the regulations issued by the Security Fund, and a questionnaire prepared by plaintiffs' attorney.

conveyed to Mishkin—feelings which were based largely or wholly on what Mishkin previously had told Winer. Tr. at 307–09, 339–42. Winer then signed the letter and Mishkin took it. Plaintiffs' Exhibit 2.

During the meeting at Winer's house, Mishkin and Winer discussed the persons to whom the letter would be sent and how it would be reproduced and mailed. Both Winer and Mishkin had a copy of the list of Mishkin's and Highcrest's creditors from the bankruptcy proceedings. It was clear to Winer that his agreement with Mishkin was that the letter would be sent to all creditors/class members on this list. Mishkin stated at the meeting that he would have the letter reproduced and mailed out for Winer by the Ossining Business Service ("OBS"). Winer Affidavit 3/16 at ¶ 10; Tr. at 343–44. Mishkin admonished Winer that it would be "inappropriate" for Mishkin to be connected in any way with this letter. Tr. at 340; Winer Affidavit 3/6 at ¶ 15.

Mishkin did not submit the full list of investor-creditors in the bankruptcy proceedings to OBS for mailing of the Winer letter. He redacted the list in order to remove duplications and the names of individuals whom he considered to be "hostile," including, but not limited to, the names of the plaintiffs in this class action. Mishkin did not advise Winer that he redacted the list, and thus Winer continued to believe that Mishkin had sent the letter to all creditor/class members. Tr. at 107–08; Winer Affidavit 3/6 at ¶ 11.

On or about Monday, December 12, 1983, Mishkin directed his employee, Patricia Hackett, a bookkeeper, to deliver the letter and the revised list of creditors/class members to OBS for reproduction and mailing to the 117 persons and entities remaining on the revised list. Tr. at 66–69. Mishkin previously had used OBS for reproduction of documents; however, most previous deliveries to and pickups from OBS were made for Mishkin by his driver employee, Franco Cirino. OBS did not know on December 12, 1983 that Patricia Hackett was Mishkin's employee, but, to the contrary, assumed that she was acting on behalf of the purported author and signatory of the letter, Winer. Tr. at 54–58, 82. The Court finds that Mishkin's use of Patricia Hackett and his conduct of the transaction with OBS was for the purpose of hiding his identity and his connection with the Winer letter. Tr. at 218.

Ms. Hackett delivered the letter and the revised list to OBS with instructions to reproduce the letter and to mail it to the 117 entities and persons on the list. Pursuant to Ms. Hackett's Instructions, OBS placed Winer's name and return address on 117 envelopes, addressed them, inserted a copy of the letter in each envelope and mailed them on or about December 12, 1983 to each of the 117 persons and entities on the redacted list. Ms. Hackett paid OBS fifty dollars in cash for the work. This fifty dollars was taken from Mishkin's petty cash fund. Tr. at 56, 60–61, 65, 69–70.

The letter written by Mishkin in the name of Winer and sent out to 117 members of this class action was materially false and misleading in several respects, and was known by Mishkin to be false and misleading at the time he prepared the letter.[5] Among its false and misleading

---

**5.** The full text of the letter is as follows:

Dear Beneficiary of
HMC INVESTMENT TRUSTS

You have probably received a form letter from Bailey & Hoeniger dated December 5, 1983, as I have.

This law firm represents four "investors" who have started a class action against Stephen A. Mishkin and others.

In my opinion, this law firm is not only seeking a monetary recovery for investments made by its clients, as well as substantial legal fees for itself, but is also conducting or supporting a vicious campaign seeking to discredit Mr. Mishkin and destroy his reputation and his professional practice. They have also created a massive and complicated law suit including a bank and other innocent persons as defendants.

If the trust beneficiaries are to be involved in this class action, I do not wish to be represented by Bailey & Hoeniger. I believe there are others who share my views, and would welcome representation which will be positive rather than negative.

Please let me know if you would like to be included in a "positive" group. I will seek independent and qualified counsel to represent our interests, subject to your consent. You will not have to complete any question-

statements are the following: (a) the statement that the law firm of Bailey and Hoeniger "is also conducting or supporting a vicious campaign seeking to discredit Mr. Mishkin and destroy his reputation and professional practice"; (b) the statement that the law firm has "created a massive and complicated lawsuit including a bank and other innocent persons as defendants"; and (c) the statement that Winer—who, as previously found, did not draft the letter—would seek "independent and qualified counsel to represent [the] interests ..." of the class members to whom the letter was sent.[6]

Mishkin, according to his answer to the amended complaint herein, was admitted to the New York Bar in 1955, and has been practicing as an attorney ever since. He was also admitted to the Bar of this Court and of the Eastern District of New York in 1957, and to the Bar of the United States Supreme Court in 1968. Mishkin appeared *pro se* in this action until February 21, 1984, when Grand & Ostrow filed a notice of appearance for him. Mishkin personally attended the pretrial conference herein on November 21, 1983, during which the Court: (1) announced its decision to certify the class; (2) approved plaintiffs' counsel's proposed notice to all known class members of their possible right to claim reimbursement from the Clients' Security Fund; and (3) repeatedly ordered that there be no further game-playing by any party.

After receiving a copy of the Winer letter of December 12, 1983 from several of the class members, plaintiffs' attorneys sent a letter to Winer dated December 21, 1983, inviting Winer to meet with them to answer any questions Winer had regarding the conduct of this action by plaintiffs'

attorneys. Plaintiffs' Exhibit 15 in evidence; Tr. at 329. Winer never responded to this letter.

In early January 1984, Winer received several written and telephonic responses to the December 12, 1983 letter. Winer took no action with respect to these responses, other than describing them to Mishkin and delivering the originals to Mishkin's office. Mishkin immediately returned these written responses to Winer, stating that "it had been [Winer's] choice to send the December 12 letter and [thus] it would be best that he [Mishkin] not have the responses in his possession." Winer Affidavit 3/6 at ¶¶ 12–13; Tr. at 367–69.

Also in January of 1984, plaintiffs' attorneys served Winer with a notice to take his deposition as a non-party witness in this action, pursuant to Rule 45(d) of the Federal Rules of Civil Procedure. Winer deposition transcript at 304 [hereinafter "Dep. Tr."]. Winer knew that at the deposition he would be questioned about the December 12, 1983 letter, and he felt frightened and upset. He thereupon telephoned Mishkin in the latter's capacity as attorney for Winer. He told Mishkin that he was frightened and asked Mishkin whether he should have legal representation at the forthcoming deposition. Tr. at 352–53. Mishkin told Winer to attend the deposition and that he did not think Winer needed an attorney present at the deposition.

In light of Mishkin's repeated prior statements that he should not in any way be connected with the December 12, 1983 letter, Winer advised Mishkin that if asked he would testify at the deposition that: (a) Winer had written the December 12, 1983 letter; (b) Winer's wife, Audrey, had deliv-

---

naire or divulge any confidential or personal information. You will not be required to pay any portion of the legal expense.
Very truly yours,
Edward I. Winer
5 Ichabod Lane
Ossining, New York 10562

**6.** The fact that the letter prefaced these materially false assertions with the phrase, "in my opinion," and that Winer testified that the letter accurately reflected his opinions, Tr. at 339–340,

does not detract from Mishkin's culpability. As discussed below, it is a violation of the Code of Professional Responsibility and of the rules for the conduct of class actions for a defendant, who is an attorney, to communicate misleading and false information to class members. Model Code of Professional Responsibility DR 7–104 (1979). Mishkin cannot circumvent these rigid standards by communicating with the class through someone else. *See Kleiner v. First National Bank of Atlanta,* 37 Fed.R.Serv.2d (Callaghan) 655, 671 (N.D.Ga.1983).

ered the letter to OBS; and (c) Winer had paid OBS for its reproduction and mailing of the letter. Winer Affidavit 4/18, 1984 at ¶ 15. Having heard Winer's proposed testimony in these three areas, and knowing it to be false, Mishkin did not advise Winer against testifying in this manner. *Id.* at ¶ 19. He merely remained silent. Winer understood Mishkin's silence to indicate agreement with the proposed testimony.[7] This understanding was based on the following factors: (a) Mishkin's repeated prior statements that it would be "inappropriate" for him to be connected in any way with the December 12, 1983 letter; (b) the fact that Mishkin was Winer's attorney, investment advisor and confidant for over thirty years; and (c) the practice and usage that had developed between the two men in their multifaceted professional and personal relationship. The court finds that under the circumstances of this case and Mishkin's prior dealings with Winer, Mishkin knew that Winer would interpret Mishkin's silence as signifying agreement with Winer's intentions to perjure himself. Indeed, Mishkin's silence was tantamount to complicity.

Winer's deposition commenced on January 27, 1984. During the first session, Winer was not asked any questions regarding the December 12, 1983 letter. Mishkin did not attend this first session, even though, at the time, he was representing himself in this class action. From January 27, 1984 until approximately February 27, 1984, Mishkin and Winer had approximately ten telephone conversations. Winer testified before this court that during one of these conversations, Mishkin may have told Winer "do what you have to do," and/or "tell the truth." Tr. at 359–60. The court doubts whether these statements were in fact made. However, assuming, *arguendo*, that Mishkin made these statements, they did not negate the understanding between Mishkin and Winer regarding how Winer would testify as to who wrote the

December 12, 1983 letter, who delivered it to OBS, and who paid for its reproduction and mailing. They did not negate Mishkin's repeated statements to Winer that Mishkin should not in any way be connected with the December 12, 1983 letter. Mishkin knew that Winer had given him his life savings for investment. Mishkin had told Winer that the class action suit was a malicious effort to destroy Mishkin. He knew that Winer would go to drastic lengths, including perjury, to protect Mishkin. Under such circumstances, the court finds that Mishkin knew that any assertion, such as "do what you have to do," or "tell the truth," was not sufficient to stop Winer from carrying out their agreement. Indeed, Mishkin testified that he had expressed the view to Winer that the December 12, 1983 letter was, in fact, Winer's letter, and that Winer should so testify at the deposition. Tr. at 232.

The court finds that in writing the December 12, 1983 letter in Winer's name, in procuring Winer's signature thereon, in arranging through Patricia Hackett for the delivery to and reproduction and mailing of the letter by OBS, in stating that it would be "inappropriate" for him to be in any way connected with the letter and in his conversations with Winer regarding the deposition, Mishkin was motivated by a desire to hide his authorship of the letter and his activities in arranging dissemination of the letter to the 117 selected class members. Thus, Mishkin, not only conveyed false information to the 117 class members, but sought further to deceive them by making it appear that the information came from a disinterested party rather than from Mishkin himself.

The second session of Winer's deposition took place on February 28, 1984. Jeffrey A. Kehl, Esq. represented Winer at this session. During this deposition, Winer testified under oath that: (a) he had written the December 12, 1983 letter, Dep. Tr. at

---

7. Although Winer is unsophisticated in legal matters and the details of this class action, he is very sophisticated in business matters. He has a Masters Degree in business, credits towards a Ph.D. in Marketing and Management, and has been in business for over ten years. He knows the plain meaning of the word "agreement" and the circumstances under which two parties can be said to have reached agreement. *See* Tr. at 365–67.

21; (b) his wife, Audrey, had taken the letter to OBS to be reproduced and mailed, Dep. Tr. at 99–100; and (c) he had paid OBS, Dep. Tr. at 101. Each of these three areas of testimony were false when given and were known by Winer to be false. After conferring with Mr. Kehl during a recess, Winer corrected portion (b) of his testimony in which he had perjuriously stated that his wife had taken the letter to OBS. Subsequently, by affidavit dated March 6, 1984, Winer corrected certain other perjurious testimony which he had given at the February 28, 1984 deposition, including areas (a) and (c) described above.

Although, as a party to this action, Mishkin had an absolute right to attend the second session of Winer's deposition, he elected not to attend. He remained absent despite his awareness of the strong possibility that Winer would perjure himself. Nor did he take any steps after the deposition to correct Winer's false and perjurious testimony.

Further relevant facts emerged from the testimony in the course of the evidentiary hearing herein.

Both Winer and Mishkin repeatedly testified that the December 12, 1983 letter, written by Mishkin, accurately reflected Winer's feelings as he had communicated those feelings to Mishkin. Assuming, *arguendo*, that this testimony is true, it is also clear that any opinion Winer had formed about this action and the conduct and motives of plaintiffs' attorneys was based exclusively on statements Mishkin had previously made to Winer and which Winer accepted as a matter of "blind trust." As previously noted, Winer had not examined a single pleading or document in this action, and had ignored plaintiffs' attorneys written invitation to meet with them to answer any of his concerns. Indeed, the December 12, 1983 letter included statements of purported fact as to which Winer had no personal knowledge, and conclusions for which Winer had no independent basis. Thus, Mishkin's portrayal of himself as simply a scrivener, accurately reflecting the "feelings" Winer had communicated to him, omits the crucial fact that Winer's "feelings" were simply a verbatim echo of thoughts previously stated and implanted by Mishkin in Winer's mind. Mishkin himself testified that Winer was easily influenced and often thought emotionally, not logically.[8]

During the Mishkin Chapter 11 reorganization case pending in the United States Bankruptcy Court for the Southern District of New York branch in White Plains, Docket No. 83 Bkcy. 20041, an additional committee to represent the investor-creditors/class members ("Additional Committee") was appointed by the United States Trustee for this District on the application of Mrs. Margaret E. Tedesco, the original named plaintiff herein, to protect the interests of the investor-creditors in the Mishkin Bankruptcy case. In August 1983, Mishkin had a telephone conversation with Mrs. Carola Novoting, a member of the class and of the Additional Committee and a long

8. The December 12, 1983 letter is similar in phrasing to another letter, dated August 6, 1970, written by Mishkin and addressed to Lawrence Silton, Esq., the attorney for Ben Polikoff. *See* Plaintiffs' Exhibit 6 in Evidence. Mr. Polikoff was an investor in American Foods Corporation, a corporate form under which defendants Mishkin and Robert L. Weil operated a yeast manufacturing facility in Baltimore County, Maryland prior to 1970. In that letter, Mishkin accused Mr. Polikoff of having a "negative" attitude, of making public "discrediting" accusations, and of being "more interested in destroying Bob Weil, or the business, or both, than in recovering his investment." The court finds that at the time he wrote this letter, Plaintiffs' Exhibit 6, Mishkin already knew that Polikoff's investments in American Foods Corporation had previously become worthless, and that Mishkin had later so testified under oath. *See Continental Illinois National Bank & Trust Co. of Chicago v. United States*, 81–1 USTC Par. 9185 at 86, 316–17 (U.S.D.C., No. D.Ill., East. Div., No. 76–c–2919, 1/23/81). The court further finds that in this letter, Mishkin recommended that Polikoff accept, in settlement of his claims, shares of stock in American Yeast corporation which at the time he wrote the letter, Mishkin knew did not have a reasonable expectation of being successful, as he likewise later testified. Despite this knowledge, Mishkin raised the threat of counterclaims and the institution of a lawsuit for slander in the event that Polikoff instituted legal action on his claims against Mishkin and American Foods Corporation. Tr. at 153–65.

standing client of Mishkin and his law firm, regarding the action of the committee. In this conversation Mishkin told Mrs. Novoting, in substance, that she had better watch what she said, because everything said at Additional Committee meetings comes back to him. The court finds that said statement was made for the purpose of influencing Mrs. Novoting and other members of the Additional Committee not to act contrary to Mishkin's interests.[9]

Mishkin's answer to the amended complaint, filed on October 25, 1983, asserted three counterclaims for a total of $60 million against the named plaintiffs herein. The counterclaims were for defamation based on allegations made by plaintiffs' attorneys in the verified complaint, the amended complaint and in other papers filed herein. The counterclaims also alleged malicious prosecution, and the intentional infliction of emotional and economic harm. Plaintiffs moved to dismiss the counterclaims, which motion was pending on April 4, 1984. On that date, in a post-hearing conference, Mishkin's attorney stated in open court that he had agreed to the withdrawal and dismissal of these counterclaims with prejudice. In light of the totality of Mishkin's conduct,[10] the court finds that the $60 million in counterclaims were asserted as an *in terrorem* device to induce the named plaintiffs to discontinue this action and for the purpose of discouraging other members of the class to participate in this action.

During his testimony before this court, Mishkin sought to conceal essential facts and committed perjury. Mishkin denied that he personally handed the unsigned December 12, 1983 letter to Winer and secured Winer's signature thereon. Tr. at 92–94, 218–21, 224–30. Mishkin's testimony in this respect is in direct conflict with the testimony of Winer and his wife, Audrey, and is contrary to the weight of credible evidence. *Compare* Tr. at 303–09, 337–42. Second, Mishkin testified that Winer did not tell him that, if asked at the deposi-

tion, Winer would testify that his wife Audrey had taken the December 12, 1983 letter to OBS and that Winer had paid OBS for the reproduction and mailing of the letters. Tr. at 232–33. This testimony is contrary to the weight of credible evidence. *See* Tr. at 354, 357, Aff. 4/18 at ¶ 15. The court finds that Mishkin's testimony in both of these areas was knowingly false. Moreover, Mishkin did not recant these statements in his affidavit filed with the court after the hearing.

## CONCLUSIONS OF LAW

Based upon the foregoing facts, established by a fair preponderance of the credible evidence, the court reaches the following conclusions of law.

 Edward I. Winer knowingly testified falsely under oath during his second deposition held on February 28, 1984 and thus committed perjury in violation of 18 U.S.C. § 1621. Winer, however, has recanted by his affidavit of March 6, 1984, his testimony at the evidentiary hearing herein and by affidavit, dated April 18, 1984. Mishkin suborned Winer's perjury, in violation of 18 U.S.C. § 1622 and aided and abetted Winer to commit perjury in violation of 18 U.S.C. §§ 2 and 1621. This subornation of perjury also constitutes a corrupt endeavor by Mishkin to influence and impede Winer in his testimony during these proceedings, in violation of 18 U.S.C. § 1503. Finally, during the evidentiary hearing conducted by this court, Mishkin knowingly testified falsely to material matters in violation of 18 U.S.C. § 1621.

 At the time Mishkin drafted and arranged for the distribution of the December 13, 1983 letter, Mishkin was an attorney of record in this case, representing himself. He was also Winer's personal attorney. Thus, Mishkin violated American Bar Association Rules of Professional Conduct as well as various of the Federal Rules of Civil Procedure, applicable to at-

---

**9.** Although Mrs. Novoting testified that she did "not necessarily understand Mishkin's statement to be a threat," Tr. at 45, the court finds that

Mishkin intended the statement as a threat and, in any event, the statement was improper.

**10.** *See, e.g., supra* note 5.

torneys.[11] Mishkin violated Rule 8.4(d) of the American Bar Association Model Rules of Professional Conduct, which provides in part: "It is professional misconduct for a lawyer to: . . . (d) engage in any conduct that is prejudicial to the administration of justice[.]" *See also* 18 U.S.C. § 1503; 28 U.S.C. § 1927. This court, pursuant to Rule 23(d), provisionally certified the class so that discovery could progress forthwith and so that the class members could be made aware of this action and their rights to seek reimbursement from New York's Client Security Fund. Mishkin, by his unauthorized, misleading and inherently coercive communications to class members frustrated the court's purposes. Instead of discovery progressing quickly and smoothly, discovery had to be suspended while the attorneys spent considerable time and effort preparing for this evidentiary hearing. Furthermore, Mishkin's communications, through Winer, likely have created fear and confusion among class members. This, of course, increases the possibility that class members will opt out, thereby defeating the policies behind Rule 23 class actions. Moreover, it is Mishkin's communications with Winer prior to Winer's depositions that impeded plaintiffs' investigation as to the reason the December 13, 1983 letter had been sent.

By communicating with the class members after this court had orally certified the class, Mishkin also violated DR 7–104(A), which provides:

During the course of his representation of a client a lawyer shall not:

(1) Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so.

*See also* ABA Model Rule 4.2. In *Kleiner v. First Nat. Bank of Atlanta,* 37 Fed.R. Serv.2d (Callaghan) 655 (N.D.Ga.1983), a case involving misconduct similar to that which occurred here, the court examined the relationship of class attorney to class members and ruled that absent class members are "parties represented by counsel," within the meaning of DR 7–104. *Id.* at 670. The court stated:

Once a class has been certified, some but not all aspects of the [attorney-client] relationship are present. A lawyer who represents the named plaintiff in a class which has been certified immediately assumes responsibility to class members for diligent, competent prosecution of the certified claims. However, it cannot truly be said that he fully 'represents' prospective class members until it is determined that they are going to participate in the class action.

The court in *Kleiner* held that an attorney-client relationship existed, at least for the limited purpose "of aiding prospective class members in deciding whether or not to join in the class action." Similarly, in this case, once the court certified the class and approved of plaintiffs' counsels' proposed notice to class members regarding the client security fund, a limited attorney-client relationship existed between plaintiffs' attorney and the absent class members. The December 13, 1983 letter was an improper communication by Mishkin "on the subject of representation," within the meaning of DR 7–104. *See Kleiner,* 37 Fed.R.Serv.2d (Callaghan) at 671.[12]

---

**11.** Mishkin's present attorneys, Grand & Ostrow, begin their memorandum of law, submitted April 30, 1984 with the anonymous quote: "The lawyer who represents himself has a fool for a client." It may very well be that Mishkin was foolish to try to represent himself in this massive securities class action. This poor choice, however, does not excuse his subsequent conduct.

**12.** The December 13, 1983 letter drafted by Mishkin accused plaintiffs' counsel of harassing Mishkin through this lawsuit. This clearly relates "to the subject of representation." The

communication was particularly detrimental to plaintiffs' attorney-client relationship because many of the class members are former clients of Mishkin, investors in Mishkin's enterprises, and had loans outstanding with one of the defendants, the Bank of New York. *See Kleiner,* 37 Fed.R.Serv.2d (Callaghan) at 669 (discussing inherently coercive effect of communications by defendant bank with absent class members). Even if Mishkin genuinely believed that plaintiffs' counsel were perpetrating a fraud either against the class members, the court, or the defendants, DR 7–104 still prohibited him from communicating with the absent class members

■ In his communications with Mrs. Novoting of the creditors' committee, Mishkin sought to impede the due and proper administration of the bankruptcy proceedings. Mishkin's statement "that everything comes back" to him was intended to convey the impression that he could force the members of the creditors committee to violate their fiduciary obligations. This was also a violation of Disciplinary Rule 9–101(C), which prohibits a lawyer from stating or implying "that he is able to influence improperly or upon irrelevant grounds any tribunal, legislative body, or public official."

## APPROPRIATE RELIEF

### A. *Prophylactic Relief*

■ Unless preventive and punative action is taken, Mishkin is likely to continue his unlawful attempts to subvert the conduct of this class action by false, misleading and coercive communications to class members. Because of this potential for abuse, the court "has both the duty and the broad authority to ... enter appropriate orders governing the conduct of counsel and parties." *Gulf Oil Co. v. Bernard,* 452 U.S. 89, 100, 101 S.Ct. 2193, 2200, 68 L.Ed.2d 693 (1981); *see Kleiner v. First Nat. Bank of Atlanta,* 99 F.R.D. 77, 78–79 (N.D.Ga.1983); Fed.R.Civ.P. 23(d). Accordingly, Mishkin is restrained from further communicating with class members so as to discourage their participation in this action or to induce class members to "opt out" of the class. Further, defendant is enjoined from interfering with the due administration and determination of this class action by the court. Mishkin's attorneys have expressly consented to the entry of such an order.

The court recognizes the first amendment problems implicated whenever the court forbids communication by counsel with class members. *See Gulf Oil Co. v. Bernard,* 452 U.S. 89, 104, 101 S.Ct. 2193, 2202, 68 L.Ed.2d 693 (1981). In *Bernard* the Court stated that the first amendment requires, "at a minimum, ... caution on the part of the district court in drafting such an order, and attention to whether the restraint is justified by a likelihood of serious abuses." *Id. See also In re R.M.J.,* 455 U.S. 191, 202–03, 102 S.Ct. 929, 937, 71 L.Ed.2d 64 (1982) (communications inherently likely to deceive or which are shown to have been deceptive, may be prohibited, provided the restriction is narrowly drawn and regulates only to extent necessary to further government's substantial interest). This court has previously found that restraining further communications by Mishkin with class members "is justified by a likelihood of serious abuses." Class recipients are particularly vulnerable to pleas on behalf of Mishkin because many of them have been and/or are legal or accounting clients of Mishkin. Moreover, because many of the plaintiffs still have large sums of money invested in several of the defendant enterprises, all of which are controlled by Mishkin, and have loans outstanding with the defendant bank, many of which were arranged by Mishkin, any communications by Mishkin to the class members regarding either the propriety of this suit or plaintiffs' counsels' representation are likely to be deceptive and coercive. The court's interest in the proper conduct of this class action pursuant to Fed.R.Civ.P. 23(d) is substantial.

Nothing in this court's order shall prevent Mishkin from communicating with class members as to matters not connected with this lawsuit. Moreover the court will allow communications with the class for the purpose of determining whether certain class members should be deposed or called as a trial witness, either in this action, or in any other action, civil or criminal. However, any contact with class members for the purpose of discovery must be done through the defendants' liaison counsel, Emmet, Marvin & Martin.

### B. *Remedy*

The court, of course, cannot be certain, without hearing testimony from each class member, as to the precise effect the De-

about their representation in this case without the prior approval of either the court or plaintiffs' counsel. New York State Bar Ass., Ethics Op. 47 (1967).

cember 13, 1983 letter had on the members of the class. In order to correct any misimpressions the letter might have conveyed, a copy of this Opinion and Order, together with an explanatory letter from plaintiffs' counsel shall be sent to all class members. Plaintiffs' proposed letter,[13] is hereby approved, with one addition. Mishkin contends that the letter implicitly gives the court's imprimatur to plaintiffs' counsel and to their case. Accordingly, the cover letter should include the caveat that it is not meant as an expression of any opinion by the court as to the merit of the lawsuit, but is sent for the sole purpose of correcting any misconceptions that might have been engendered by the December 12, 1983 letter.

## C. Sanctions

■ This court bears the responsibility for the supervision of the attorneys appearing before it. *Hull v. Celanese Corp.*, 513 F.2d 568, 571 (2d Cir.1975). This responsibility carries with it the inherent power to impose monetary sanctions against members of its Bar for misconduct. *In re Sutter*, 543 F.2d 1030, 1035–36 (2d Cir.1976); *Kleiner*, 37 Fed.R.Serv.2d (Callaghan) at 675; *Esser v. A.H. Robins Co.*, 537 F.Supp. 197, 200 (D.Minn.1982). The imposition of sanctions, including monetary sanctions,

upon members of the Bar of this court does not depend upon a prior finding of contempt.[14] *In re Sutter, supra*, 543 F.2d at 1037–38; *see Miranda v. Southern Pacific Transportation Co.*, 710 F.2d 516, 521 (9th Cir.1983). Moreover, the court has the inherent power to levy monetary sanctions against a party. *Kleiner*, 37 Fed.R.Serv.2d (Callaghan) at 676 (citing *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 765, 100 S.Ct. 2455, 2463–64, 65 L.Ed.2d 488 (1960)). With regard to the misconduct at issue here, Mishkin is subject to sanctions both as an attorney and as a party litigant.

■ Ordinarily, Rule 23 requires plaintiffs to advance the cost of preparing and mailing notice to class members. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). These costs are to be taxed against the defendant only if plaintiffs ultimately prevail on the merits. *Cole v. Schenley Industries, Inc.*, 60 F.R.D. 81, 86–87 (S.D.N.Y.1973). However, because the explanatory notice is necessitated by Mishkin's previous misconduct with respect to this action, Mishkin is hereby required to reimburse plaintiffs' attorneys for the cost of preparing and distributing notice of this opinion to the class members. Mishkin shall pay to plaintiffs' attorneys a reasonable service charge, not to exceed $2,000.00.[15]

**13.** Plaintiffs' proposed letter reads as follows:
Dear class member:

We write this letter in our capacity as attorneys for the class plaintiffs, and in accordance with the directions of the United States District Judge David N. Edelstein.

Previously, a letter dated December 12, 1983 and bearing the signature of one Edward I. Winer, was sent by Stephen A. Mishkin, a defendant herein, to 117 members of the class. The Court has determined that such letter was false and misleading, and the Court has imposed sanctions against Stephen A. Mishkin for his wrongful conduct.

In compliance with Judge Edelstein's directions, we enclose a copy of the Court's Opinion and Order dated [February 25, 1986]. We urge you to read it carefully to correct any improper impressions created by the Winer/Mishkin letter of December 12, 1983. If you have any questions, please call [plaintiffs' counsel].

**14.** Plaintiffs' counsel contends that Mishkin's conduct warrants the court's use of its contempt

power. The contempt power, however, may only be employed when a party has willfully violated a clear and precise court order. Although Mishkin's conduct in arranging for the mailing of the December 12, 1983 letter was reprenhensible, it did not violate any specific court order. At the pre-trial conference held on November 21, 1983, the court warned the parties that it would tolerate no further "game playing." This order was not specific enough to warrant imposition of contempt sanctions.

**15.** By letter dated May 25, 1984, plaintiffs' attorneys proposed that they be allowed up to $3,500 for the mailing to the class members. Their calculation of costs was arrived at as follows:

| | |
|---|---|
| Photocopying 45 pages at 10 cents per page | $4.50 |
| Postage (8+ ounces) | 1.39 |
| 9″ × 12″ Envelopes (each) | .20 |
| Address labels + labor, per addressee | 1.50 |
| Cost per class member | $7.59 |

Multiplying $7.59 by the 300 class members produces $2,277. According to the plaintiffs, "the additional $1,223 is simply a safety margin"

Plaintiffs' counsel are also entitled to costs, including attorneys' fees reasonably incurred in uncovering, proving, and applying for relief from Mishkin's misconduct. This expenditure of time and services was necessitated by Mishkin's wrongful conduct and was substantially increased by the extensive hearings and testimony required to bring these matters to conclusion. The need for much of the testimony could have been eliminated if Mishkin and his counsel in good faith had stipulated to known facts. Plaintiffs' counsel estimate that their reasonable costs and attorney's fees to uncover, prove and apply for such relief was $94,050.35. They break down their fees as follows: Mr. Hoeniger's work consisted of approximately 157 hours at $200 per hour; Mr. Bailey devoted approximately 152 hours at $225 per hour and Mr. Getnick devoted 148 hours at $150 per hour. The value of these services aggregates to $87,775. Plaintiffs' counsel also seek $6,275.35 for costs including court and deposition transcripts, witnesses' fees and mileage, service of subpoenas, messenger charges, travel expenses, extensive reproduction expenses, charges for computer research and stenographic overtime. The court finds the $6,275.35 in costs to be reasonable. However, the court finds that counsels' application for attorney's fees is unreasonably high to address the letter signed by Mr. Winer and his subsequent false testimony. No more than two attorneys were necessary to work on this issue. Accordingly, the court finds that one-third of the $87,775 constituted unreasonable attorney's fees. Plaintiffs' counsel are entitled to two-thirds of the $87,775 which equals $58,517, in addition to their $6,275.35 in costs, for a total of $64,792.35 in reasonable costs and attorney's fees. Mishkin has 90 days from the date of this Opinion and Order to pay this assessment.

▮ In addition to these compensatory assessments, the court hereby imposes a punitive sanction of $10,000 on Mishkin for his false and misleading communications to class members, threats, subornation of perjury, and other *in terrorem* tactics. Mishkin is to deposit $10,000 in the registry of the court within 60 days of the date of this Opinion and Order.

Finally, Mishkin claims that he is unable to pay costs and attorneys' fees and therefore the award of costs and attorneys' fees should be denied. Mishkin asserts that in his bankruptcy case, he testified that title to all of the real estate that is listed on his financial statement is his wife's property. Plaintiffs contend that this testimony simply reinforces the point that Mishkin has been engaged in the fraudulent conveyance of assets during the past several years in order to insulate himself against the claims of members of the class and other creditors. Plaintiffs further contend that Mr. Mishkin either owns substantial assets or has such assets in his control. Mishkin's counsel's conclusory claims that "there is a significant question of Mishkin's inability to pay costs and attorney's fees" and that "[M]ishkin is broke" are rejected due to the absence of adequate facts set forth to support these self-serving claims. *Compare Faraci v. Hickey-Freeman Co.,* 607 F.2d 1025, 1028–29 (2d Cir.1979) (attorney award struck down where district court "failed to give consideration to Faraci's credible and

---

if any of the cost items should exceed the above estimate. Mishkin contends that $3,500 is grossly excessive and that he should not be required to pay more than $1,000 for the distribution of this opinion and the explanatory cover letter.

Plaintiffs' counsel has overestimated its costs, because the courts opinion is only 31 pages rather than 45. This decreases plaintiffs' estimated photocopying and postage costs. Moreover, plaintiffs do not need a safety margin of over $1,000. If, after sending the notice as prescribed by the court in this opinion, plaintiffs can prove to the satisfaction of this court that they reasonably expended a sum greater than $2,000, the court will tax the additional amount to Mishkin.

Mishkin's contention that the notice ought only to be sent to the 117 class members who received the December 12, 1983 notice is rejected. The court must treat all class members the same for the purpose of notice in order to avoid any confusion among the class members or the appearance of impropriety. Moreover, the court finds it likely that other class members, in addition to the 117 that received the December 12, 1983 letter, heard about the letter and its contents.

uncontroverted affidavits listing his monthly income" and therefore failed "to take the relative wealth of the parties into account").

CONCLUSION

Steven Mishkin is hereby restrained from further communications with class members so as to discourage their participation in this action or to induce class members to "opt out" of the class. In addition, Mishkin is enjoined from interfering with the due administration and determination of the class action by the court.

In order to correct any misimpressions the December 13, 1983 letter had on the members of the class, a copy of this Opinion and Order, together with counsel's proposed letter shall be sent to all class members. The cover letter should include the caveat that it is not meant as an expression of any opinion by the court as to the merit of the lawsuit, but is sent for the sole purpose of correcting any misconception that might have been engendered by the December 13, 1983 letter.

Because the explanatory notice is necessitated by Mishkin's previous misconduct, Mishkin is hereby required to reimburse plaintiffs' counsel for the cost of preparing and distributing notice of the opinion to the class members. Mishkin shall pay to plaintiffs' counsel a reasonable service charge not to exceed $2000. Plaintiffs are entitled to reasonable costs and attorney's fees amounting to $64,742.35. Finally, as a punitive measure, Mishkin is sanctioned $10,000 for his actions.

SO ORDERED.